IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,       :

      Plaintiff,

   v.                                        :       Case No. 3:16-CV-232

DAYTON INDUSTRIAL DRUM,                 JUDGE WALTER H. RICE
INC., et al.,

      Defendants.              :

---

DECISION AND ENTRY SUSTAINING MOTION OF UNITED STATES
TO ENTER CONSENT DECREE WITH SUNOCO (DOC. #84);
TERMINATION ENTRY

---

Plaintiff, United States of America ("Plaintiff" or "United States"), has filed a Motion to Enter the Consent Decree with Sunoco, Inc., Doc. #84. ETC Sunoco Holdings, LLC, f/k/a Sunoco, Inc. ("Sunoco"), has filed a Response. Doc. #85. The United States has filed an affidavit of counsel, exhibits and a reply. Docs. ##87 and 88.

The proposed Consent Decree resolves Plaintiff's claims against Sunoco and Carboline Company ("Carboline") for the recovery of unreimbursed response costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") § 107(a), 42 U.S.C. § 9607(a).[1] These costs were incurred

---

[1] Sunoco has an indemnity and joint defense arrangement with Carboline, a Missouri company. Doc. #83-1, PAGEID#4521. The proposed Consent Decree, signed by both

by the United States Environmental Protection Agency ("EPA") for the clean-up of the Lammers Barrel Superfund Site in Beavercreek, Ohio (the "Site").  In addition to resolving liability in this case ("the 2016 Case"), the settlement also gives Sunoco and Carboline protection from contribution claims alleged against them in *Lammers Barrell PRP Group v. Carboline Co.*, *et al.*, Case No. 3:17-cv-135, United States District Court for the Southern District of Ohio (the "2017 Case").[2]  The Government, in both the 2016 and the 2017 Cases, alleges that Sunoco and/ or Carboline are the legal successors to the Moran Paint Company and have CERCLA liability for its actions as an owner/operator of the Site and as an arranger. The proposed Consent Decree requires Sunoco to pay $1,300,000.[3] Doc. #83.

Sunoco orally accepted the terms of the proposed Consent Decree on December 13, 2019. Doc. #85-1, PAGEID#4567.

On December 20, 2019, the Court held a telephone status conference for the 2017 Case.  The purpose of the call was to advise counsel in that case of the Court's rulings on several pending motions for summary judgment and motions for partial summary judgment.  Counsel for Plaintiff in the 2016 Case requested to

---

Sunoco and Carboline, define Sunoco as the "Settling Defendant" and Carboline as an "Additional Covered Party." *Id.*

[2] Except where it is necessary to indicate the identity of the individual defendant, the Court will refer to Carboline and Sunoco collectively as "Defendants."

[3] Although only Carboline was named as a Defendant in the 2017 Case, the Lammers Barrell PRP Group alleged, in the alternative, that Sunoco was the successor to Moran Paint. Doc. #1, PAGEID#8.

2

be included on the call.  Before the Court announced its rulings in the 2017 Case,

counsel for the United States informed the Court and all attorneys in the 2017

Case of the settlement with Sunoco and that the settlement included Carboline.

Counsel for Defendants acknowledged the settlement and stated their clients had

signed the proposed Consent Decree.  Counsel for Plaintiff stated she expected

approval from the appropriate government official in mid-January.  At the request

of counsel for Plaintiff and Sunoco, the Court agreed to stay all dates in the 2016

Case, pending the filing of the proposed Consent Decree.  The Court then orally

announced its rulings on the motions and on the motions for partial summary

judgment in the 2017 Case.  Counsel were told that the motion for summary

judgment filed by Defendants Sunoco and Carboline, Doc. #60, as well as two

other motions for summary judgment filed by other PRP defendants, had been

sustained.  A Decision and Entry in the 2017 Case, overruling plaintiff's motion for

partial summary judgment and sustaining Defendants' motion for summary

judgment, was filed March 27, 2020 ("Decision"). Doc. #87. This Decision found

that there was no genuine issue of a material fact that either Carboline or Sunoco

had successor liability for the actions of Moran Paint during the time period it was

a prior owner/operator of the Site or for the time period that it was allegedly an

arranger. *Id.*

Sunoco, on behalf of itself and Carboline, filed its Response to Plaintiff's

Motion to Enter the Consent Decree on March 20, 2020.  It states that Defendants

do not oppose the proposed Consent Decree, "have not 'reneged' on the deal"

and that "everyone should evaluate the proposed Consent Decree in the full light of [the] decisions" in the 2017 Case. Doc. #85, PAGEID#4559. Finally, Sunoco contends that the proposed Consent Decree may be unenforceable, since it is not signed by the Assistant Attorney General of the Environmental and Natural Resources Division ("ENRD").

For the reasons set forth below, the Motion to Enter Consent Decree with Sunoco, Doc. #84, is sustained.

## I. Background

### A. The Site

The Site includes a 2.5 acre property from which hazardous substances were released (the "Property"), an adjoining ditch, a contaminated aquifer underlying the property and a contaminated portion of the aquifer that extends eastward and downgradient from the Property. From approximately 1944, until a fire burned down its operations in 1951, the Moran Paint Company ("Moran Paint") manufactured various hazardous substances at the Property including paint, lacquers and paint removers. Doc. #4, PAGEID#29. Moran Paint also owned the Site from at least 1948 to 1951. *Id.*

In approximately 1951, Moran moved from the Site and in 1957 relocated to Xenia, Ohio. *Id.* After its move to Xenia, Moran Paint allegedly continued to use the Site to dump hazardous wastes. In October 1963, it was purchased by Carboline Company of Ohio, a wholly owned subsidiary of Carboline. *Id.*,

4

PAGEID#30.  Shortly after the purchase, the name was changed from Carboline Company of Ohio to the Moran Paint Company.  The company continued its dumping of hazardous waste at the Site until 1969, when a fire destroyed the Site's operations.  *Id.*

Kohnen-Lammers operated a spent solvent treatment and reclamation business at the Site from approximately 1952 until the fire in 1969.  *Id.*, PAGEID#30.  At the request of its customers, Kohnen-Lammers picked up the spent solvent from the customer's facilities and brought it back to the Site.  *Id.*, PAGEID#31.  Moran Paint, both before and after its October 1963 purchase by Carboline Company of Ohio, was a customer of Kohnen-Lammers.  *Id.*, PAGEID#33.

Lammers Barrel, a barrel-reconditioning facility, was located at the Site from approximately 1955 to 1964.  *Id.*, PAGEID#27.  Part of its reconditioning process included the dumping of any residual waste oils, solvents, and other chemicals remaining inside the barrels into an initial drain pit.  The contents of the drain flowed into an underground septic tank at the Site.  *Id.*, PAGEID#28.  In 1972, Lammers Barrel changed its name to Dayton Industrial Drum, Inc.  *Id.*

In 1985, the Ohio EPA detected vinyl chloride in residential drinking water wells that were downgradient from the Site.  By 2000, a total of thirteen area homes had been connected to an alternate water supply.  *Id.*, PAGEID#23.  A remedial investigation and feasibility study ("RI/FS") was conducted in 2002 for the purposes of determining the nature and extent of contamination, and to study

5

and compare the feasibility of potential remedies for the Site contamination. *Id.* Originally, 21 parties ("Respondents") agreed to perform the RI/FS pursuant to an Administrative Order on Consent ("AOC"). Twenty additional Respondents were added in 2008. *Id.*

The Site is divided into Operable Unit 1("OU-1") and Operable Unit 2 ("OU-2"). OU-1 addresses on-site soil and groundwater contamination and OU-2 addresses a plume of groundwater contamination that has migrated off-site. *Id.*, PAGEID#24. In 2011, the EPA issued a Record of Decision ("ROD") selecting cleanup remedies for OU-1. *Id.* A remedy for OU-2 has not yet been selected. The remedial action that EPA selected for OU-1 is being performed under a Remedial Design/Remedial Action (RD/RA) Consent Decree. This decree was entered into in 2014 by the Lammers Barrel PRP Group, plaintiff in the 2017 Case, in *United States v. 3M Co.*, et al., No. 3:14-cv-00032, 2014 WL 1872914 (S.D. OH. May 5, 2014).

## B. The 2016 Case

On June 10, 2016, the United States filed its Complaint against Dayton Industrial Drum, Inc., the alleged successor to Lammers Barrel, Inc., asserting liability under § 107 of CERCLA, 42 U.S.C. § 9607(a). On August 2, 2016, an Amended Complaint was filed joining Sunoco as a defendant. Plaintiff alleged successor liability by operation of law against Sunoco, including joint and several liability under CERCLA for the actions of Moran Paint. As alleged, successor

6

liability exists for Sunoco due to certain "corporate transactions" beginning in October 1963, when Carboline purchased Moran Paint, and concludes with Carboline's merger into Sunoco in approximately 1980. Doc. #4, PAGEID#30. Damages sought include the "unreimbursed costs incurred for response activities undertaken in response to the release or threatened release of hazardous substances from facilities at and near the Site." Doc. #4, PAGEID#19.  A declaratory judgment for any further costs not covered by other parties is also requested.

The parties in the 2016 Case engaged in discovery, including depositions of both lay and expert witnesses.  Following a mediation, a settlement was reached between the United States and Dayton Industrial Drum, Inc.  On July 3, 2019, a consent decree was entered by the Court.  The case continued with Sunoco as the sole defendant. Doc. #56.

On October 8, 2019, Sunoco filed a motion for summary judgment, Doc. #64, and the United States filed a motion for partial summary judgment on the recovery of response costs under CERCLA and the propriety of the EPA's response actions. Doc. #65.  In its motion for partial summary judgment, the United States asserted, among other things, that it had "incurred at least $1,840,023.81 in unreimbursed response costs through July 31, 2016." *Id.*, PAGEID#2845.  Plaintiff also filed a motion for partial summary judgment on the issue of Sunoco's corporate successorship. Doc. #67.   This motion includes as exhibits numerous documents, depositions and a 64-page expert witness affidavit and report.  The

affidavit and report opined that by virtue of its 1980 merger with Carboline,

Sunoco is the corporate successor to Moran Paint Company.  Docs. ##62 and 63.

Because of the settlement reached by the United States and Sunoco on

December 13, 2019, no decision was issued by the Court on the cross-motions for

summary judgment.

### C.  The 2017 Case

On April 21, 2017, Lammers Barrel PRP Group (the "PRP Group") filed a

contribution complaint under CERCLA § 113(f), 42 U.S.C. § 9613(f).  The Complaint

seeks damages against several potentially responsible parties ("PRPs") for past

and/or future response costs incurred by the PRP Group at the Site due to the

release and threatened release of hazardous substances at and from the Site.

Carboline and "alternatively Sunoco," are named as defendants.  The Complaint

also sought a declaration of liability for future response costs to be incurred by

the PRP Group.  Discovery was conducted.  In August of 2019, the PRP Group filed

a motion for partial summary judgment on the issue of successor liability against

Carboline.  The motion argued that Carboline was liable under CERCLA for the

actions of Moran Paint as an owner/operator of the Site and for their actions as an

arranger. Doc. #65.  Defendants filed a motion for summary judgment arguing

that no successor liability exists for Moran Paint Company.  Doc. #60.

On March 27, 2020, the Court issued its Decision overruling the PRP

Group's motion for partial summary judgment against Carboline and sustaining

8

Defendants' motion for summary judgment. Doc. #87. Based on the evidence presented in the 2017 Case, the Court found that there was no genuine issue of a material fact that Defendants had any successor liability for Moran Paint Company as either an owner/operator or as an arranger.

### D. The Proposed Consent Decree

The Consent Decree requires Sunoco to pay $1,300,000 to the United States for its claim of $1,840,023.81 in unreimbursed response costs through July 31, 2016. Claims against Defendants in both the 2016 Case and the 2017 Case will be resolved.

The United States published notice of the proposed Consent Decree in the Federal Register and solicited public comments for a 30–day period. 42 U.S.C. § 9622(d)(2)(A). 85 Fed. Reg. 3077 (Jan. 17, 2020). No comments were received other than a comment from counsel for Defendants. This comment recommends that the proposed Consent Decree not be entered until after the Court issues its decision in the 2017 Case dismissing the contribution claims against Sunoco and Carboline. Sunoco's comment further states that depending on the basis of the Court's decision, the Department of Justice "should evaluate whether the proposed Consent Decree remain[s] fair, reasonable and consistent with CERCLA, and, in particular, whether the settlement payment should be reduced." Doc. #84-

2, PAGEID#4557.[4]  The proposed Consent Decree was lodged January 13, 2020.

Doc. #83.


## II. Analysis

### A. Standard of Review

CERCLA authorizes the President "to remove or arrange for the removal

of[,] and provide for remedial action relating to [any] hazardous substance,

pollutant, or contaminant at any time ... or take any other response measure ...

necessary to protect the public health or welfare or the environment." 42 U.S.C.

§ 9604. The statute also grants the President the authority to enter into

settlements.  These settlements include those "with any person (including the

owner or operator of the facility from which a release or substantial threat of

release emanates, or any other potentially responsible person ["PRP"]), to

perform any response action ... if the President determines that such action will be

done properly by such person." *Id.* § 9622(a).

A consent decree is both a judicial act that requires court approval and an

agreement that "embodies a compromise in exchange for the saving of cost and

elimination of risk." *U.S. v Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757

---

[4] Plaintiff argues in its Motion to Enter the Consent Decree, filed March 2, 2020, that because Sunoco agreed not to oppose the entry of the Consent Decree, Doc. #83-1, PAGEID#4532, its public comment is invalid and does not preclude the Court from entering the Consent Decree before this Court's Decision in the 2017 Case. Doc. #84-1, PAGEID#4543. Because the Court filed its Decision on March 27, 2020, Plaintiff's argument is moot.

10

(1971). A court's role in reviewing a proposed consent decree, however, "is limited to approval or rejection of the decree and it remains EPA's responsibility to select the remedy and to take the steps necessary to bring the decree to the court for approval." *U.S. v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1425 (6th Cir 1991). The Sixth Circuit requires that "in addition to determining whether a decree is rational and not arbitrary or capricious, [the District Court] must satisfy [itself] that the terms of the decree are fair, reasonable and adequate - in other words, consistent with the purposes that CERCLA is intended to serve." *Id.*, at 1435. (internal quotation marks and citations omitted). The key consideration in assessing whether a decree is fair, reasonable and adequate under the statute is the public interest. *Id.* A presumption favoring settlement terms in a consent decree is particularly strong where it "has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *U. S. v. Lexington-Fayette Urban County Government*, 591 F.3d 484, 490 (6th Cir. 2010) (citing *Akzo Coatings*, 949 F.2d at 1436).

In this case, although Defendants assert that they "do not oppose the Consent Decree" and have not "'reneged' on the deal," Doc. #85, PAGEID#4559, they are seeking a reduced settlement payment. *Id.*, PAGEID#4563; Doc. #89. They argue that this Court's "adjudications of no liability [in the 2017 Case] may have significant bearing on whether the proposed Consent Decree [remains] fair, reasonable, consistent with CERCLA's goals, and substantively and procedurally

11

fair." Doc. #85, PAGEID#4560.   Defendants also question whether the Consent Decree is enforceable since it is signed by a Section Chief of the Environmental and Natural ENRD ("ENRD") and not by the Assistant Attorney General.  Doc. #85, PAGEID#4563.

The Court will now turn to an analysis of the proposed Consent Decree to determine whether the settlement was both procedurally and substantively fair, reasonable and consistent with the goals of CERCLA.

### B.  The Consent Decree is Procedurally Fair

A determination of whether a settlement was procedurally fair requires a court to "look to the negotiation process and attempt to gauge its candor, openness[,] and bargaining balance." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir.1990) (citations omitted).  In making this determination, courts consider both the time involved in reaching the settlement and the representation of the parties in the negotiation.

The United States contends that the parties participated in a day-long in-person mediation conducted by an independent mediator.  Throughout the litigation and during this process, the parties were represented by experienced counsel.  According to Plaintiff, settlement negotiations continued with the submission of confidential memoranda, telephone calls and emails.  Thereafter, additional discovery was conducted, discussions continued and a final agreement

was reached. In addition to this process, the statutorily required 30-day public comment period was held. No objection to the settlement was received.[5]

Defendants do not challenge Plaintiff's assertion that the proposed Consent Decree was procedurally fair.

For the above stated reasons, the Court finds that the negotiation process and the resultant settlement were procedurally fair.


## C. The Consent Decree is Substantively Fair

Substantive fairness in the context of a consent decree depends, in part, on the existence of procedural fairness. "To the extent that the process was fair and full of 'adversarial vigor,' the results come before the court with a much greater assurance of substantive fairness." *Cannons Eng'g Corp.*, 899 F.2d at 87 n. 4 (quotation omitted). "In determining whether a decree is 'fair,' courts have considered ... 'the strength of plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel[,] and the possible risks involved in the litigation if the settlement is not approved.'" *Akzo Coatings*, 949 F.2d at 1433.

In this case, Defendants do not dispute that they entered into a settlement with the United States that resolved both the 2016 and 2017 Cases. They argue, however, that in CERCLA consent decrees "a party should bear the cost of the

---

[5] Defendants' comment, dated February 12, 2020, requests only a re-evaluation of the settlement amount depending on the grounds stated by the Court in its Decision in the 2017 Case sustaining the Sunoco/Carboline motion for summary judgment, Doc. #84-2.

harm for which it is legally responsible." *Cannons Eng'g Corp.*, 899 F.2d at 87. Because of this Court's Decision in the 2017 Case, Defendants assert that the settlement is not substantively fair.  Accordingly, they contend that Plaintiff should "re-evaluate" Sunoco's payment of $1.3 million.  Doc. #84-2, PAGEID#4558

Plaintiff argues that despite Defendants assertions, they are trying to renege on the settlement and that "settlement agreements should be upheld whenever it is equitable to do so." *Rusiecki v. City of Marquette*, 64 Fed. App'x 936, 938 (6th Cir. 2003).  The United States asserts that it is equitable to uphold this settlement, because the evidence it presented on the issue of successor liability "went far beyond the limited evidence offered" by the PRP Group in the 2017 Case. Doc. #88, PAGEID#4711.  Specifically, the United States contends that it relied on the testimony of several expert witnesses and "did not rely solely on the deposition testimony taken under Fed. R. Civ. P. 27 of Anthony Kohnen and Cecil Brown." *Id.*

As stated earlier in this Decision and Entry, the negotiation process was procedurally fair.  All parties were represented by competent counsel and the 2016 Case involved extensive discovery. The settlement included an independent mediator, offers and further discovery.  As such, the process was fair and full of "adversarial vigor." *Cannons Eng'g Corp.*, 899 F.2d at 87 n. 4.  Additionally, the United States and Defendants entered into their settlement on December 13, 2019, before the Court had ruled on the cross-motions for summary judgment in the 2016 Case and one week before the Court announced its rulings on the motions for summary judgment in the 2017 Case.  Although Defendants could have

14

delayed entering into a settlement with the United States, they chose to enter into a compromise that eliminated their risk and gave up something they might have won had they proceeded with the litigation. *Armour & Co.*, 402 U.S. at 681-682.

Accordingly, the Court finds that the component of whether the Consent Decree is substantively fair is satisfied.  Although the Court reaches no decision on the issue of Sunoco's corporate successorship for Moran Paint as argued in the cross-motions for summary judgment in the 2016 Case, the Court will review the evidence of Sunoco's alleged successor liability for Moran Paint, as an owner/operator and as an arranger to determine if the proposed Consent Decree is substantively fair.

### 1. Evidence of Sunoco's Successor Liability for Moran as an Owner/Operator

Plaintiff argues that, unlike the 2017 Case, their evidence establishes a *de facto* merger for the October 1963 purchase of Moran Paint by Carboline and that this, in turn, creates liability for Sunoco.[6] *Welco Indus., Inc. v. Applied Cos.* 617 N.E. 2d 1129 (Ohio 1993) (*de facto* merger includes continuation of previous business and corporate personnel, continuity of shareholders resulting from sale of assets in exchange for stock, immediate or rapid dissolution of the predecessor corporation and assumption by purchaser of liabilities and obligations).

The evidence in Plaintiff's motion for partial summary judgment on Sunoco's corporate successorship, Doc. #67, addresses critical issues of the

---

[6] Sunoco merged with Carboline in 1980. Doc. #4, PAGEID#30.

existence of a *de facto* merger between Moran Paint and Carboline. This evidence, which was not offered in the 2016 Case, includes Carboline's contemporaneous reports to the Security and Exchange Commission ("SEC"), indicating stock purchase options given to former Moran Paint managers and corporate officers subsequent to October 1963. Docs. #62-36 and #62-37. Additionally, financial information from Moody's Industrial Manuals shows significant increases in both assets and liabilities for Carboline following the October 1963 purchase of Moran Paint. This information indicates an assumption of liabilities by Carboline. Docs. #62-38 and Doc. #63-1, PAGEID#2640-45. Plaintiff's evidence also includes a 64-page affidavit/expert report of an economist detailing the background of both the purchase by Carboline of Moran Paint in October 1963 and the merger of Carboline and Sunoco in 1980. This expert report concludes that Sunoco is the corporate successor to Moran Paint. Doc. #63.

Based on the above referenced evidence in this case on the issue of Sunoco's successor liability for Moran Paint as an owner/operator, the Court finds that the Consent Decree is substantively fair.

### 2. Evidence of Carboline's Successor Liability for Moran as an Arranger

Plaintiff also contends that it included critical evidence on the issue of Sunoco's successor liability for Moran Paint as an arranger in the 1950s and 1960s

that was not submitted in the 2017 Case.[7] This evidence included an admission by Sunoco's current counsel, acting as counsel for Carboline, stating that "Moran Paint had limited dealings with the Lammers Barrel [sic], which consisted solely of: (a) purchasing clean solvents from Lammers; (b) sending used barrels to be cleaned and resold to Moran; and (c) shipping small amounts of solvents to the Site for reclaiming." Doc. #74-1. In addition to this testimony, Plaintiff also presented evidence from expert witnesses in environmental engineering and paint, coatings and solvent manufacturing. Docs. ##74-11 and 74-17. These experts established, based on photographs of the Site, soil and water analyses and knowledge of industry standards concerning solvents and the handling of wastes, that Moran Paint arranged for disposal of hazardous substances at the Site. Doc. #74-11, PAGEID#3303; Doc. #74-17, PAGEID#3372. Finally, the United States also included a report of an expert witness interpreting aerial photographs of the Site taken during the period of 1940 to 1968. Based on these photographs, the expert in aerial photography concluded that from 1957 through 1968, there were open storage areas at the Site with "numerous drums and vertical tanks" and evidence of soil staining. Doc. #87-2.

_____

[7] In the 2017 Case, the PRP Group relied on the testimony of two deceased witnesses, Anthony Kohnen and Cecil Brown, to establish successor liability of Sunoco and Carboline for the arranger liability of Moran Paint. The testimony of these two witnesses, however, was determined to be inadmissible due to Plaintiff's failure to comply with Fed. R. Civ. P. 27(a)(1)(D). Doc. #86.

Based on the above referenced evidence in this case on the issue of Sunoco's successor liability for Moran Paint as an arranger, the Court finds that the Consent Decree is substantively fair.

### D. The Consent Decree is Reasonable and Consistent with the Goals of CERCLA

The reasonableness of a consent decree under CERCLA requires consideration of several factors, including "the nature/extent of hazards; the degree to which the remedy will adequately address the hazards; possible alternatives for remedying hazards; and the extent to which the decree furthers the goals of the statute." *Akzco Coatings*, 949 F. 2d at 1436 (citation omitted).  The inquiry of whether a proposed Consent Decree is reasonable, "like that of fairness, is a pragmatic one, not requiring precise calculations." *United States v. Charter Intern. Oil Co.*, 83 F.3d 510, 521 (1st Cir.1996).

The proposed Consent Decree requires Sunoco to pay $1,300,000 to the United States.  Of this amount, $189,000 will be deposited in the EPA's Lammers Barrel OU-2 Superfund Special Account and treated as a credit towards future costs of the OU-2 RD/RA activities. Doc. #83-1, PAGEID#4527. The remaining settlement monies will be deposited in the EPA's Lammers Barrel Site Superfund Special Account.  This amount will be applied as a credit toward the EPA's unreimbursed site-wide costs of $1,840,023.81.  *Id.*, PAGEID#2845.

This Court has previously determined that the EPA has set forth an adequate plan for the initial steps to eliminate contamination at the Site and that the proposed OU-1 remedy and the future OU-2 remedy at the Site serve the public interest. *See United States v. 3M Co.*, et al., No. 3:14-cv-00032, 2014 WL 1872914 (S.D. OH. May 5, 2014). Moreover, Defendants do not challenge the amount of the unreimbursed response costs of the EPA, nor the allocation of the amount of the $1.3 million settlement.

Additionally, the two statutory goals of CERCLA are "ensuring prompt effective remedial action while placing the financial burden of the cleanup on the PRPs." *Akzo*, 949 F.2d at 1439. As such, CERCLA strives to accomplish "accountability, the desirability of an unsullied environment, and promptness of response activities." *Cannons*, 899 F.2d at 91.

Based on the above, the Court finds that the proposed Consent Decree is reasonable and consistent with statutory goals of CERCLA.

### E. The Proposed Consent Decree is Enforceable

Defendants' final argument is that the proposed Consent Decree may be unenforceable because it was to be signed by the Assistant Attorney General and, instead, was signed by the Section Chief of the ENRD. According to Defendants, the "ENRD Section Chief only has authority to compromise a CERCLA claim 'where such costs do not exceed $1 million, exclusive of interest, and the difference between the United States claim and the proposed settlement does not

19

exceed $500,000.' 28 C.F.R. Part 0, Subpart Y, Appx., Dir. 90-50." Doc. #85, PAGEID#4563. Sunoco argues that Plaintiff has alleged "millions in costs" at the Site and that the difference between the "millions in costs" and the proposed $1.3 million settlement exceeds $500,000. *Id.* Accordingly, Sunoco contends, the ENRD Section Chief has no authority to compromise this claim and the Consent Decree is unenforceable.

In response, the United States asserts that the Section Chief for the Environmental Enforcement Section ("EES")[8] has authority to sign the proposed Consent Decree pursuant to ENRD Directive No. 2016-04, a 2016 Directive, and that Sunoco cites to an "outdated Division Directive from 1990 that has been superseded multiple times." Doc. #88, PAGEID#4709. The Government further explains that the EES Section Chief has authority to compromise claims "asserted by the United States in which the gross amount of the original claim does not exceed $10,000,000." *Id.*, PAGEID#4611. Because the future response costs are estimated to be $4 million for Operable Unit 2 and the EPA claim for unreimbursed costs is approximately $3 million, the $10,000,000 amount of authority of the EES Section Chief is not exceeded. Doc. # 54-3, PageID#781; Doc. #55-1, PageID#792; Doc. #61, PageID#2380.

Sunoco's argument that the "ENRD Section Chief" lacks authority to enter into this settlement is without merit. The "Environmental and Natural Resources

---

[8] The EES is a division within the ENRD.

Division Directive No. 2016-04" ("Directive") supersedes Sunoco's 1990 directive, giving the EES Section Chief the authority to compromise this approximately $7 million claim.

Accordingly, the proposed Consent Decree is enforceable.

## III. Conclusion

For the reasons set forth in this Decision and Entry, the Motion of the United States to Enter Consent Decree, Doc. #84, is SUSTAINED.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: April 2, 2021

_____

WALTER H. RICE
UNITED STATES DISTRICT JUDGE